UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| LINDY R. URSO, fiduciary of the Estate of Father Bernard Champagne,<br><br>*Plaintiff,*<br><br>*v.*<br><br>AMIR MOHAMMAD,<br><br>*Defendant.* | Civil No. 3:20cv0674 (JBA)<br><br>March 10, 2023 |

**RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    Summary of Decision

In March 2020, Defendant Amir Mohammad issued a Directive in his capacity as Town of Orange Health Director that cancelled "all devotional or religious acts such as daily and weekly congregational prayers, and other religious gatherings" until further notice. Former Plaintiff Father Bernard Champagne, a Catholic priest in the Town of Orange who was subject to the Directive's cancellations, brought suit to challenge the Directive under 42 U.S.C. § 1983. Father Champagne claimed that the Directive violated his First Amendment rights to Freedom of Assembly (Count 1), Freedom of Speech (Count 2), Free Exercise of Religion (Count 3), and his Fourteenth Amendment Equal Protection right by preventing him from saying mass and freely practicing his religion when secular activities were not similarly restricted; he also claimed that the Directive violated the Establishment Clause (Count 4) by expressing condemnation of his religion. Substitute Plaintiff Lindy Urso, fiduciary of the estate of the now-deceased Plaintiff Father Bernard Champagne, now moves for summary judgment [Doc. # 80], asserting that he is entitled to judgment as a matter of law on all claims. Defendant Amir Mohammad, sued in his official capacity, cross-moves for summary

1

judgment [Doc. # 76], claiming Eleventh Amendment immunity, that Plaintiff lacks standing, that Plaintiff's claims for injunctive relief are moot, and that binding Supreme Court precedent entitles him to judgment as a matter of law.

For the reasons stated below, Defendant's motion for summary judgment is GRANTED in part as to Counts 1, 2, and 4, but is DENIED as to his Eleventh Amendment immunity defense and as to Counts 3 and 5. Plaintiff's motion for summary judgment as to Counts 1, 2, and 4 is DENIED as moot, and is DENIED as to Counts 3 and 5 because genuine disputes of material fact remain that require resolution at trial.

## II.    Background

### A.    Governor's Orders

On March 7, 2020, Governor Ned Lamont reported the first two known cases of COVID-19 in individuals who worked in Connecticut; the next day, he reported the first case of COVID-19 in a Connecticut resident. (Def.'s Loc. Rule 56(a)(1) Stmt. of Facts [Doc. # 77] ¶¶ 1-2.) On March 10, 2020, he issued the "Declaration of Public Health and Civil Preparedness," ("March 10 Declaration") declaring public health and civil preparedness emergencies, and pursuant to Conn. Gen. Stat. § 19a-131a(f), authorized the Commissioner of Public Health to "delegate the powers regarding isolation or quarantine to municipal and district directors of public health." (Def.'s Exhibit A [Doc. # 77-1].) The declaration further states that "[m]unicipalities, local health officials, and local education officials are directed to follow previously issued guidance and apply relevant principles of risk management to decisions about whether to cancel, modify, or postpone large gatherings, public events, or travel." (*Id.*) Connecticut's online COVID-19 data report for that day reflects a total case count of 9. (*See* Connecticut COVID-19 Cases, Deaths, and Tests by Day, CT.gov, available at https://data.ct.gov/Health-and-Human-Services/COVID-19-Case-Deaths-and-Tests-by-Day/g9vi-2ahj (last accessed June 30, 2022)) ("Connecticut COVID-19 Cases").

2

On March 12, 2020, the Governor issued Executive Order 7, which prohibited social gatherings of 250 people or more, and applied to "social and recreational activities including, but not limited to, community, civic, leisure, or sporting events; parades; concerts; festivals; movie screenings; plays or performances; conventions; and similar activities . . . ." but explained that "[n]othing in this order shall prohibit any spiritual gathering or worship service." (Executive Order 7. Def.'s Exh. B [Doc. # 77-2].) Connecticut's online COVID-19 data report for that day reflects a total case count of 49. (Connecticut COVID-19 Cases.) Executive Order 7 also cited CDC and Connecticut Department of Public Health recommendations for "implementation of community mitigation strategies to increase containment of the virus and to slow down transmission of the virus, including cancellation of large gatherings and social distancing in smaller gatherings. . ." (Def.'s Exh. B at 8.) The Order stated that COVID-19 was a disease that "spreads easily from person to person and may result in serious illness or death," and that "the risk of severe illness and death from COVID-19 appears to be higher for individuals who are 60 years of age or older." (*Id.*)

After issuing the original Executive Order 7, the Governor continued to issue modifications as the pandemic unfolded; Executive Order 7A through 7C restricted entrance into nursing homes, modified in-person open meetings requirements, cancelled public school classes for at least two weeks, and provided for remote business at the Department of Motor Vehicles, among other measures meant to mitigate COVID-19 spread. (Executive Order 7D, Def.'s Exh. C [Doc. # 77-3].) On March 16, 2020, Executive Order 7D modified the original Executive Order 7's prohibition on social or recreational gatherings, limiting them to 50 people for groups "including but not limited to, community, civic, leisure, or sporting events; parades; concerts; festivals; plays or live performances; conventions; and similar activities, *as well as religious, spiritual or worship gatherings.*" (*Id.*) (emphasis added). It also required indoor dining, indoor fitness facilities, and movie theaters to "cease all operations."

(*Id.*) By this time, Connecticut's online COVID-19 data report for that day reflects that the total case count was 126. (Connecticut COVID-19 Cases).

Executive Order 7E through 7M restricted social and recreational gatherings to fewer than 50 people, closed bars and restaurants, closed gyms, fitness centers, and movie theaters, closed large shopping malls and places of public amusement, and limited workplace operations of non-essential businesses. (*See* Executive Order 7N, Def.'s Exh. D [Doc. # 81-1].) Executive Order 7N, issued March 26, 2020, limited social and recreational gatherings to 6 people, but provided that "[r]eligious, spiritual, or worship gatherings shall not be subject to such increased restrictions, and shall instead remain subject to the prohibition on gatherings of 50 or more people, provided that they employ reasonable and appropriate distancing measures." (*Id.*)

### B.   Defendant's Involvement

Defendant was appointed as the Health Director of the Town of Orange in November 2016. (Def.'s Dep. Tr. [Doc. # 81-1] at 24.) He described his responsibilities as ensuring that the town was following state guidance, maintaining compliance with permit issuances, supervising sanitation licensing and permitting, presenting at board of health meetings, and reporting cases of state-defined reportable diseases and conditions within the Town of Orange to the state. (*Id.* at 26-27.) As Health Director, he is not required to obtain permission from the Town Board of Health or other town authorities before making a decision related to public health, but remains terminable by the town selectman. (*Id.* at 28-29.)

Defendant testified at his deposition that he understood the Governor's March 10 Declaration to "delegate[]" the power to him as Town Health Director to "ensure that we apply all the resources and tools of risk management that we have to continue to save our community from this deadly, lethal virus." (*Id.* at 85.) On the same day that Executive Order 7D was issued—March 16, 2020—Defendant issued the public health guidance statement at

issue ("Directive") titled "Decisions Regarding Cancellation of Congregational Prayers and Religious Events in Town of Orange due to Coronavirus (COVID-19) Pandemic." (Pl.'s Exh. G [Doc. # 81-1].) The Directive stated that "all devotional or religious acts such as daily and weekly congregational prayers, and other religious gatherings <u>shall be canceled until further notice</u>." (*Id.*) The Directive stated that the steps were "taken as precautionary measures to limit community transmission of Coronavirus pandemic through people contact [sic] and large gatherings at these religious buildings located in the town of Orange." (*Id.*)

Defendant testified that at the time he issued the Directive, the "current body of knowledge" was "to protect our vulnerable population, meaning elderly and children," and that Orange "has one of the highest per capita retirees living in our town, so we have quite a bit of vulnerable population." (Def.'s Dep. Tr. at 69.) It was the Defendant's understanding that schools were closed by the school superintendent, which Defendant had recommended, and restaurants and gatherings were prohibited by the Governor's order. (*Id.*) Defendant testified that because the "larger component of our population belonged to elderly" and "other activities had already been put on close," the Directive was an attempt "agreed upon from our religious clergy group leaders to streamline the communication so there's no confusion." (*Id.* at 107.)

A revised guidance statement was published May 13, 2020 ("Revised Directive"), titled "Allowing Congregational Prayers and Religious Events in Town of Orange Starting May 20, 2020," which allowed religious institutions and houses of worship to resume religious gatherings of 50 people or less while employing distancing measures consistent with the Governor's orders. (Pl.'s Exh. L [Doc. # 81-1].) The Revised Directive encouraged modification of specific "religious rites, rituals, and services" in ways such as avoiding shaking hands, hugging, kissing, and holding hands, and wearing masks and social distancing. (*Id.*)

### C.       Father Champagne's Involvement

Prior Plaintiff Father Bernard Champagne became the priest for Our Lady of Sorrows Church ("OLOS") in Orange in 2003. (Def.'s 56(a) Stmt. ¶ 24). His duties there included hosting confession and offering communion to the parishioners at "all hours." (*Id.* ¶ 25.) In March 2020, each mass had between 12 and 40 people, and the occupancy limit was between 50 to 60 people. (Father Champagne's Dep. Tr. [Doc. # 81-1] at 49.)

On April 28, 2020, Sergeant Jonathan DeRubels of the Orange Police Department called Father Champagne and told him that the police department had been notified that OLOS Church was hosting services on Sunday. (Pl.'s 56(a) Stmt. ¶ 27; Dep. Tr. of Robert Gagne, Pl.'s Exh. J [Doc. # 81-1] at 49-50.) Sergeant DeRubels told Father Champagne that the Governor prohibited all gatherings exceeding 5 people, including mass, and that any gathering under five people required a facial covering; Father Champagne was further told that OLOS could not hold a mass because it would be against the law, even for 5 people, and that the repercussions could include misdemeanor summons and bad publicity. (Pl.'s 56(a) Stmt. ¶ 27.) Sergeant DeRubels made this call at the request of Chief Robert Gagne, who testified the purpose of the call was getting Father Champagne to follow the Directive; Chief Gagne also emailed David Junko, OLOS' board member, to inform him that according to Defendant, OLOS was required to lock its doors. (Pl.'s 56(a) Stmt. ¶ 31-32.) No member of the Board ever directed Father Champagne to stop offering religious services, lock the church, or change the way he offered services. (Def.'s 56(a) Stmt. ¶27.) Father Champagne's recollection of the conversation with Sergeant DeRubels was that he was told he was not allowed to open the church or have mass in the church; Father Champagne testified that he informed the policeman that he intended to continue saying mass. (Champagne's Dep. Tr., Pl.'s Exh. H [Doc. # 81-1] at 67-68.)

On April 29, 2020, Father Champagne testified that a police officer came to the church and told him the church needed to be locked up, to which Father Champagne replied that he had "no intention of locking it up[.]" At this point, the policeman asked Father Champagne for the key, which Father Champagne gave him, and the officer locked the side door to the church before returning the key to Father Champagne. (Champagne's Dep. Tr. at 74-76.) This effectively locked the church, as the front door was already locked. (*Id.*) The policeman also told Father Champagne that he needed to hand out Holy Communion into people's hands rather than on their tongues, and Father Champagne told the officer "I will never do that," whether the police officer approved or not and regardless of what the officer was telling him to do. (Champagne's Dep. Tr. at 76, 109.) After the officer left, Father Champagne waited about two hours, and then decided to unlock the church door because he decided he was "not going to lock this church up." (Champagne's Dep. Tr. 79.) There were no services scheduled to take place during the time the church was locked, and no services were cancelled. (Def.'s 56(a) Stmt. ¶ 37.)

Notwithstanding Father Champagne's testimony, Defendant notes that there is no record of the officer's dispatch or visit other than Father Champagne's recollection. (*See* Def.'s Response to Pl.'s 56(a) Stmt. ¶¶ 33-37.) The identity of the officer is unknown; Father Champagne did not recall his name. (Champagne's Dep. Tr. at 74.) An email exchange from April 29, 2020 between Chief Gagne and OLOS Board Member David Junko reflects that Junko wrote at 12:56pm, "*[w]e* just locked the church." (Email Exchange Re: Public Health Order, Pl.'s Exh. K [Doc. # 81-1].) (emphasis added).

After the officer's visit, Father Champagne told people coming in for confession or communion that he was not going to lock the church and continued giving communion and confession. (Champagne's Dep. Tr. 80.) The parties dispute whether the incident impacted services that Father Champagne offered. Father Champagne asserts that he refrained from

hosting Mass at parishioners' homes because he feared arrest. (Pl.'s 56(a) Stmt. ¶ 11.) Defendant responds that Father Champagne never identified any instances in which he declined to hold mass at a parishioner's home in Orange. (Def.'s Response to Pl.'s 56(a) Stmt. ¶ 38.) At one point, Father Champagne testified that he never decided not to hold a mass, turned anyone away from confession, refused anyone last rites, turned anyone away for counseling, or refused to offer communion as a result of the officer's instructions, and that he could not "recall any time I was supposed to have a service and I couldn't because" of the police visit or the March 16th Directive. (Champagne's Dep. Tr. 82.) When Father Champagne heard on the radio that religious services were allowed in Orange again, he testified that his reaction was that he hadn't stopped providing religious services during that time, so it "didn't affect me." (Champagne's Dep. Tr. at 87.) However, Father Champagne also testified that he would not have gone out to anyone's house to say mass if they had asked him to because it would have risked getting them in trouble. (Champagne's Dep. Tr. at 118.) Specific instances in which Father Champagne allegedly declined to perform a mass based on fear of prosecution are discussed in greater detail below.

Father Champagne left Our Lady of Sorrows in November 2020; he passed away on April 21, 2021. (Champagne's Dep. Tr. at 52; Def.'s 56(a) Stmt. ¶ 41.)

### D.   Procedural History

The complaint was filed on May 14, 2020.[1] An amended complaint [Doc. # 24] was filed on June 19, 2020, to reflect removal of OLOS as a plaintiff. Lindy Urso was substituted as a plaintiff following the death of Father Bernard Paul Champagne on July 29, 2021 [Doc. #

---

[1] Former Plaintiff Father Champagne's motion for a temporary restraining order was denied on May 18, 2020.

51]. Defendant filed his motion for summary judgment [Doc. # 76] and Plaintiff filed his cross motion for summary judgment [Doc. # 80] on July 18, 2022.

## III.   Legal Standard

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 162 (2d Cir. 2016). In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." *LaFond v. Gen. Physics Servs. Corp.*, 50 F.3d 165, 175 (2d Cir. 1995). "When cross motions for summary judgment are made, the standard is the same as that for individual motions. The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *United Indus. Corp. v. IFTE plc*, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). Where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact. *Cortes v. MTA N.Y. City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)). "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid

summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).[2]

## IV.  Discussion

### A.  Defendant's Motion for Summary Judgment

Defendant raises four grounds for summary judgment: (1) Defendant is entitled to Eleventh Amendment immunity; (2) Plaintiff lacks standing based on a lack of injury; (3) Plaintiff's injunctive claims are moot; and (4) under *Jacobson,* Plaintiff's claims fail as a matter of law.[3] (Def.'s Mem. in Support of Mot. for Summ. J. [Doc. # 78].)

#### 1.  Eleventh Amendment Immunity

"The Eleventh Amendment generally bars suits in federal court by private individuals against non-consenting states." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015). This immunity "encompasses not just actions in which a state is actually named as a defendant, but also certain actions against state agents and instrumentalities." *Id.* An individual who is an employee of a town, county, or municipality may be an agent of the state if he or she is acting pursuant to state authority or on the state's behalf. *See Willis v. Rochester Police Dep't,* No. 15-CV-6284-FPG, 2018 WL 4637378, at *4 (W.D.N.Y. Sept. 27, 2018) (noting that district attorneys in New York are agents of the state when prosecuting a criminal matter, rather than the county); *Valmonte v. Perales*, 788 F. Supp. 745, 754 (S.D.N.Y. 1992), *on reconsideration sub nom. Valmonte v. Bane*, 812 F. Supp. 423 (S.D.N.Y. 1993), *rev'd on other grounds*, 18 F.3d 992 (2d Cir. 1994) (finding that the commissioner of a county department

---

[2] Unless otherwise indicated, internal citations, quotation marks, and other alterations are omitted throughout in text quoted from court decisions.

[3] Because there is significant overlap between the fourth ground Defendant raises for summary judgment and the substance of Plaintiff's motion for summary judgment, the two are addressed together in Section B on Plaintiff's motion for summary judgment.

of social services was a state official because the social services program was a state program, under supervision of the state department of social services, and county commissioners were denominated by statute as agents of the state social services department.)

Defendant reasons that by instructing local health officials in the Governor's March 10 Declaration to "follow previously issued guidance and apply relevant principles of risk management to decisions about whether to cancel, modify, or postpone large gatherings, public events, or travel," and by directing the Commissioner of Connecticut Department of Public Health to delegate her powers to local health officials by invoking Conn. Gen. Stat. § 19a-131a(f), the Governor made Director Mohammad an agent of the state. (Def.'s Mem. at 14.) Conn. Gen. Stat. § 19a-131a(f), governs declarations of public health emergencies and states that the Connecticut Commissioner of Public Health "may delegate to . . . any local health director, as much of the authority of the commissioner described in this section as the commissioner determines appropriate," and that the local health director given such authority "shall act as an agent of the commissioner." Because the Connecticut Department of Public Health is an arm of the state, Defendant asserts that he should also be considered an arm of the state as the Commissioner's agent. (*Id.*)

The question here is twofold: first, the Court must determine whether the state delegated the power to limit large gatherings to local health directors, including Defendant; second, it must determine whether the Directive was issued in Defendant's capacity as a Town of Orange official, or within the scope of any authority delegated to him by the state. The Governor's March 10 declaration (1) directs the Commissioner to "delegate powers regarding isolation or quarantine" to local directors of public health, and (2) directs local officials to "follow previously issued guidance and apply relevant principles of risk management to decisions about whether to cancel, modify, or postpone large gatherings,

public events, or travel," includes a delegation of the power to restrict or cancel large gatherings. (March 10 Declaration, Def.'s Ex. A.) As Defendant observes, § 19a-131 sections (6) and (9), define isolation and quarantine as both contemplating "separation of individuals or groups of individuals whom the commissioner believes might be infected, or even suspects of having been exposed to infectious disease, in order to limit further transmission of the disease." (Def.'s Reply to Pl.'s Opp'n [Doc. # 100] at 3.) In March 2020, with little ability to determine who had and had not been exposed or infected, it is reasonable to interpret the statute's definitions of "isolation" and "quarantine" to include orders or directives limiting the size of gatherings based on a "reasonable belief" that someone in any large gathering would be contagious or exposed to the virus given the unknown nature of COVID-19 at the time, and the Court interprets the March 10 declaration to include a delegation of power to restrict gatherings of those who might be infected or had been exposed.

As for the second part of the inquiry, Plaintiff maintains that because the state has no role in appointing the Town of Orange's officers or controlling Defendant's day-to-day operations, Defendant was not acting as an agent of the state in issuing the Directive. To determine whether a particular action taken by a dual local-state official qualifies as being an action by a state entity, the Court looks to *Baez v. Hennessy,* in which the Second Circuit found that district attorneys act as agents of the State, rather than their assigned county, when prosecuting criminal matters. 853 F.2d 73, 77 (2d Cir. 1988). The court there considered that an indictment constitutes an accusation "on behalf of the state" and must be titled "the people of the state of New York" against a designated person. *Id.* Although the district attorney had the discretion to determine "when and in what manner" to prosecute a suspected offender, the state had the right to fill district attorney vacancies and establish minimum salaries, and the county had "no right to establish a policy" governing how the

district attorneys should prosecute violations of state law or to remove a district attorney from office. *Id.*

Unlike the role of the prosecutor contemplated in *Baez,* this record shows that Defendant was acting primarily in his role as a town health director when issuing the Directive. He was still subject to termination by the first selectman of the Town of Orange, and the Directive was issued on Town of Orange letterhead. (*See* Def.'s Dep. Tr. at 29.) While the Directive references the delegation of authority to local health directors from the Governor and Commissioner, claiming to act "under the command and authority of the Government in his exercise of his emergency powers," that is not enough to entitle an individual to Eleventh Amendment immunity where he was employed and paid by the Town and was not acting under the Governor's control when taking the challenged action. *Smith v. Avino*, 866 F. Supp. 1399, 1403 (S.D. Fla. 1994), *aff'd*, 91 F.3d 105 (11th Cir. 1996). *Smith* addressed a situation similar to this; the Governor issued an executive order in the aftermath of Hurricane Andrew allowing city and county officials to impose curfews, and defendant was a county manager who had imposed such a curfew. *Id.* at 1401. The court found the "mere fact that authority to impose the [c]urfew may have been delegated to [defendant] by the Governor is not dispositive" because defendant "exercised policy-making authority" in choosing among various courses of action, the executive order "authorized" but did not "require" the imposition of a curfew, the defendant could have issued a curfew even absent the Governor's authority, and there was no evidence that defendant's issuance of the curfew was "reviewable by the Governor or directly constrained by policies established by the Governor." *Id.* at 1402-1403.

Defendant testified that he understood the March 10 declaration permitted him to do whatever it took to preserve life and mitigate the spread of infection based on the circumstances of his town, and that he had the discretion to determine what those measures

might be; he did not identify any constraints. (Def.'s Dep. Tr. 85, 93-94.) Defendant also testified that he read the Governor's executive orders to leave open how they should be interpreted to permit application of risk management principles, and that he did not anticipate the Governor exercising supervisory control over him because the "governor is not going to come to Orange and tell the executive what to do." (*Id.* 103-104, 153); *cf. Bojicic v. DeWine,* 569 F. Supp. 3d 669, 691 (N.D. Ohio 2021), *aff'd,* No. 21-4123, 2022 WL 3585636 (6th Cir. Aug. 22, 2022), *cert. denied,* No. 22-493, 2023 WL 192013 (U.S. Jan. 17, 2023) (holding that when "carrying out the orders of the Health Director," or "complying with state mandates that *afford no discretion*," city and county officials are "acting as an arm or officer of the state and [are] entitled to immunity under the Eleventh Amendment") (emphasis added.) Based on the lack of constraints, control, reviewability, or direct connection between the Directive and a mandatory order of the state, the Court finds that the Directive was not issued in Defendant's capacity as a state agent.

Defendant has failed to show entitlement to Eleventh Amendment immunity, and his motion for summary judgment on that basis is denied.

## 2. Standing

"'Article III restricts federal courts to the resolution of cases and controversies.'" *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016). Accordingly, a party seeking to invoke a federal court's jurisdiction must "have standing—the personal interest that must exist at the commencement of the litigation.'" *Id.* The "irreducible constitutional minimum" of standing has three elements: there must be an "injury in fact," a "causal connection between the injury and the conduct complained of," and it must be "likely . . . that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An injury-in-fact must be "concrete and particularized and actual or imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

In his motion for summary judgment, Defendant challenges Plaintiff's standing, and as "a federal civil rights plaintiff [, he] has the burden to establish standing . . . by affidavit or other evidence" making "a factual showing of perceptible harm." *New Creation Fellowship of Buffalo v. Town of Cheektowaga, N.Y.*, No. 99-CV-460A(F), 2004 WL 1498190, at *13 (W.D.N.Y. July 2, 2004), *subsequently aff'd sub nom. New Creation Fellowship of Buffalo v. Town of Cheektowaga*, 164 F. App'x 5 (2d Cir. 2005). When moving for summary judgment based on a lack of standing, however, a defendant "is entitled to summary judgment [] only if [he] establishes that, viewing the evidence and drawing reasonable inferences in the light most favorable to the non-moving party, there are no genuine disputes of material fact regarding whether a plaintiff has standing." *Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 542 F. Supp. 3d 232, 238 (S.D.N.Y. 2021).

Defendant's arguments that Plaintiff lacks standing to bring each of his five claims are further detailed below.

      **a)**      **Injury in Fact for Free Assembly (Count 1), Freedom of Speech (Count 2), Free Exercise (Count 3), and Equal Protection (Count 5) Claims**

For Freedom of Speech, Freedom of Assembly, and Free Exercise claims, two injuries will confer standing:[4] The first "occurs when 'the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution[,]'" which courts have characterized as an "imminent" injury. *Libertarian Party of Connecticut v. Merrill*, No. 15-CV-1851 (JCH), 2016 WL 10405920, at *4 (D. Conn. Jan. 26, 2016) (quoting *Babbitt v. United*

---

[4] Because the Equal Protection Claim is premised on the Free Exercise claim, the Court's finding on standing for First Amendment purposes will extend to the standing for Equal Protection purposes.

*Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). The second "occurs when a plaintiff is 'chilled from exercising her right to free expression or foregoes expression in order to avoid enforcement consequences[,]'" which courts have character as "actual" injury. *Id.*, (quoting *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014)). Plaintiff also alleges an alternative theory of "actual" injury: the "psychological consequence" of feeling excluded based on the Defendant's "disapproval and hostility" conveyed towards religion through the Directive. (Pl.'s Opp'n at 20.)

Plaintiff claims he shows all three types of injury; Defendant argues that he can show none.

### (1)    Psychological Consequence

The Supreme Court held in that *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982), that a "psychological consequence presumably produced by observation of conduct with which one disagrees" is "not an injury sufficient to confer standing under Art. III." However, Plaintiff points to *Cath. League for Religious and Civil Rights v. City and Cnty. of San Francisco*, 624 F.3d 1043, 1053 (9th Cir. 2010), for the proposition that in limited circumstances, a psychological consequence *is* enough to constitute actual injury. There, the Ninth Circuit held that plaintiffs had standing to challenge a city resolution calling the religious belief that homosexuality was a sin "hateful and discriminatory," and "insensitive and ignorant," because it sent a message that the plaintiffs as Catholics who held those beliefs were outsiders rather than members of the political community. *Id.* at 1052-53. Father Champagne testified in his deposition that he understood the Defendant to be "drawing people away from God," and the Directive made him "angry" and "drove him nuts," (Champagne's Dep. Tr. at 97.) He also testified that "every time I said a mass after that, I felt threatened, even the congregation could be arrested for my defying that cop and saying mass anyway," which he found "disturbing" even though the

16

arrest "didn't go into effect." (Champagne's Dep. Tr. at 115.) On this basis, Plaintiff asserts that Father Champagne suffered psychological injury.

*Catholic League* is both out of circuit and is distinguishable.[5] The Ninth Circuit addressed its tension with *Valley Forge* by explaining that "observation of conduct with which one disagrees" is not sufficient to constitute actual injury, but the psychological consequence of "exclusion or denigration on a religious basis within the political community" that resulted in a "chilling of access to the government" is a more concrete harm that satisfies the standing requirement. First, there has been no "official condemnation by [the] government" of Father Champagne's religious views or an "urging by [the] government that [] local religious representative defy their church[.]" The Directive does not take aim at the beliefs of Catholicism, or any other religion, in its wording; it does not condemn the religious aspect of the gatherings or cancel them because of the beliefs being expressed there, but because of the COVID-19 risk that the gatherings pose. The language of the Directive thus stands in sharp contrast to the one in *Catholic League,* where the city resolution called the plaintiff's religious beliefs "hateful" and urged members of the church to abandon those beliefs.

Second, the record does not show that the Directive's expressive value psychologically impacted Father Champagne; he testified that he was not even aware of the Directive until the police officer arrived to enforce it, and there is nothing in the record to suggest that he read the Directive or was offended by the language of the Directive itself. The

---

[5] Additionally, as Defendant observes, *Catholic League* concerned an Establishment Clause claim; unlike freedom of speech, association, or exercise, the constitutional right enshrined by the Establishment Clause is the right to be free of being stigmatized by the government's decision to endorse one religion over another; courts have consistently recognized that Establishment Clause claims receive a different standing analysis and are defined by a different kind of injury. (*See* Def.'s Reply at 6.)

record also does not reflect either officer that Father Champagne spoke to expressing disapproval of the fact that the masses were religious gatherings, or for Catholicism. Father Champagne may have perceived the enforcement of the Directive as trying to draw people away from God, but that psychological impact cannot be tied to a single instance in the record where Defendant or the officers enforcing the Directive expressed disapproval or hostility towards the *religious* aspect of the gatherings being cancelled. Further, unlike the plaintiffs in *Catholic League* who alleged that their "participation in the political community will be chilled by the City's hostility to their church and their religion," *Id.* Plaintiff offered no evidence of "chilling [of his] access to the government," which "forc[ed] [him] to curtail [his] political activities to lessen [his] contact with defendants." *Id.* (emphasis added).

The Court rejects Plaintiff's theory of actual injury.

### (2)    Threat of Prosecution

An "allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Driehaus*, 573 U.S. at 159, including when the plaintiff "alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Id.*  To establish standing to assert a pre-enforcement First Amendment claim, this Circuit applies "somewhat relaxed standing . . . rules," *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 690 (2d Cir. 2013), with a "a low threshold" that "is quite forgiving to plaintiffs seeking such preenforcement review," *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016). "A plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury, but only that it has an actual and well-founded fear that the law will be enforced against it." *Vermont Right to Life Committee, Inc. v. Sorrell,* 221 F.3d 376, 382 (2d Cir. 2000).  However, the claim of a "*possible* future injury is not sufficient to confer standing,"

*Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). A plaintiff still must "demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

To establish standing under this theory, Plaintiff must show both that Father Champagne had a "real and imminent" actual fear of arrest or prosecution, and that the threat of prosecution was credible such that Father Champagne's fear was "well-founded." *Vermont Right to Life Committee,* 221 F.3d at 382. Plaintiff argues that Father Champagne faced a credible threat of enforcement based on the representation made by Sergeant DeRubels during the phone call with Father Champagne that he could be served with a misdemeanor summons, the testimony from Chief Gagne that the ultimate consequence for violating the Directive would be making an arrest, and the visit by an officer to the church, all of which contributed to Father Champagne's fear of arrest. (Pl.'s Opp'n at 22.) Defendant maintains that there was never a "credible, reasonable threat of prosecution" based on "a record of one telephone call from the police lasting less than six minutes," which gave the police "no reason to pursue prosecution even if they were inclined to do so, which they were not." Defendant also argues that Father Champagne's testimony as to whether he feared arrest was "self-contradicting," and that the "roughly six minutes of interaction with the police" throughout "months-long noncompliance" is not reflective of a credible threat. (Def.'s Mot. at 21.)

Father Champagne's testimony demonstrates that he contemplated the *possibility* of arrest; whether he feared *imminent* arrest is less clear. When describing his reaction to the call from Sergeant DeRubels, he said he "wasn't really interested in what he was saying to

me," and that he felt "shock, anger, and resentment," but never expressed that the phone call itself caused him to fear arrest. (Champagne's Dep. Tr. at 141.) At one point, he testified that "I suppose I *could* have gone to prison or something for it if they enforced it more," (*id.* at 100) (emphasis added), a belief he based on a news story in which he heard that a pastor in another town was threatened with prison for keeping his church open before the police decided to back down, not specific actions that were taken by the Town of Orange Police. (*Id.* at 102.) Father Champagne did testify that that the officer's visit made him think "I'm going to be arrested for functioning as a Catholic priest," (*id.* at 113.) However, "standing must be judged at the time of filing of the complaint." *Digizip.com, Inc. v. Verizon Servs. Corp.*, 139 F. Supp. 3d 670, 676 (S.D.N.Y. 2015). The question is not whether Father Champagne feared arrest on the day that the police visited in March, but whether he still feared arrest two months later on May 14, 2020, when he filed suit—at which point the March 16, 2020 Directive had been lifted, and the police had not contacted or visited him again in the intervening months.  The Court finds that there is no evidence in the record demonstrating that he imminently feared arrest at the time of the filing of the complaint, even if he may have feared it before.

Plaintiff also cannot show that the threat of prosecution was credible. When evaluating the second part of the inquiry, "[t]he identification of a credible threat sufficient to satisfy the imminence requirement of injury in fact necessarily depends on the particular circumstances at issue." *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015). A direct threat of enforcement against the plaintiff may suggest that the threat of prosecution is credible. *See Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) (finding standing for a casino when the village attorney was quoted in a newspaper article as saying the village would move to shut down the casino for violations of the ordinance, the casino had been served with orders to remedy the violations, and it had been advised of an upcoming

enforcement action). Here, Sergeant DeRubels told Father Champagne that he *could* be served with a misdemeanor summons if he continued violating the Directive but did not tell Father Champagne in the phone call that he *would* be served with a misdemeanor summons, and did not tell Father Champagne that he was going to be arrested; in fact, he told Father Bernard that a misdemeanor summons would be the "last thing" the police wanted to do. (Pl.'s Exh. I, Audio Call between Father Champagne and Sergeant DeRubels.) As for the unnamed officer that visited the church, when Father Champagne was asked if that officer ever threatened him with arrest, he said "I don't believe [the officer] said that" (Champagne's Dep. Tr. at 89); he later specified that the officer told him that if he did not comply, he "*could* be arrested and prosecuted, he didn't say I *would* be, he said I *could* be." (Champagne's Dep. Tr. at 112) (emphasis added).

The use of "could" suggests a possibility of prosecution, but neither a direct threat nor an imminently impending prosecution, and distinguishes Plaintiff's case from *Cayuga,* where the village announced that it *would* enforce an ordinance against a casino both in the newspaper and directly to the casino. A possibility of future prosecution does not alone establish a credible threat where Chief Gagne testified that upon receiving the complaint that Our Lady of Sorrows was continuing to hold masses in violation of the Directive, "my directions to the sergeant was that we were *not* going to take enforcement action," and that the purpose of the call was to make sure Father Champagne "understood what the [Directive] was and that he shouldn't be having Mass at this point in time—that there was a restriction on that issued by the Public Health Department." (Gagne Dep. Tr. at 49-50) (emphasis added).

The Court also considers "the extent of [] enforcement"—or lack thereof—in "determining whether a credible threat of prosecution exist[ed]" against Father Champagne. *Adam v. Barr*, 792 F. App'x 20, 23 (2d Cir. 2019). Although Chief of Police Gagne testified at

his deposition that the ultimate consequence for individuals violating the Directive generally was "the police department getting involved in enforcing it and making an arrest. Or a summons," (Gagne Dep. Tr. at 17), he also testified that the police did "enjoy discretion" in determining whether or not to enforce it, and that the police were "very, very cautious about enforcing it in a way that was too heavy handed." (*Id.* at 24); *cf. Hardaway v. Nigrelli,* No. 22-CV-771, 2022 WL 11669872, at *4 (W.D.N.Y. Oct. 20, 2022) (finding a credible threat of prosecution when the Deputy State Police Superintendent for New York stated that "if you violate this law, you will be arrested. Simple as that," emphasized that the troopers would have "zero tolerance," and that troopers were "standing ready" to ensure that "all laws are enforced.") There is also no evidence in the record that there was any instance of the Directive being enforced through misdemeanor summons, arrest, or prosecution.

The absence of any enforcement action against Father Champagne himself is also a factor the Court considers in evaluating the credibility of the threat. In *Torcivia v. Suffolk Cnty., New York*, 409 F. Supp. 3d 19, 39 (E.D.N.Y. 2019), *aff'd*, 17 F.4th 342 (2d Cir. 2021), the plaintiff lived in a county where the pistol license handbook stated that "if a police officer or member of the pistol license bureau requests you to surrender your license and firearm(s), and you refuse . . . you may be arrested and charged with . . . a Class A misdemeanor." *Id.* at 38. Plaintiff was a pistol owner who was arrested and transferred to a psychiatric ward; an officer asked him to surrender his firearms, Plaintiff refused to speak with him or hand over the combination to his gun safe. *Id.* at 28. Despite his refusal, he was never charged with a crime and did not have his license revoked on the grounds that he had refused to turn over his weapons. The court found that because he had "expressly engaged in conduct that would purportedly cause him to be arrested or prosecuted and yet he was neither arrested nor prosecuted," he "failed to demonstrate a credible threat of future prosecution." *Torcivia v.*

*Suffolk Cnty., New York*, 409 F. Supp. 3d 19, 39 (E.D.N.Y. 2019), *aff'd*, 17 F.4th 342 (2d Cir. 2021).

Similarly, in *Does 1 - 10 v. Suffolk Cnty., New York*, No. 21-1658, 2022 WL 2678876, at *3 (2d Cir. July 12, 2022), the plaintiffs alleged that they received a letter from the police department that their firearms were "not in compliance with the New York State Penal Law" and that they "may be subject to criminal charges" if they "fail to present the weapon" to the police in 15 days. However, the plaintiffs did not present their weapons, were not arrested, and did not have their firearm forcibly confiscated, nor did any purchaser of a similar firearm have it forcibly confiscated. The plaintiffs' counsel acknowledged at oral argument in *Does 1-10* that the county had "not so much as contacted any individual Doe about the firearms since sending the May 20, 2021 letter." Based on the "the subsequent developments (or lack thereof) in this case," the Second Circuit found that the plaintiffs had "not established that their prosecution is likely, or otherwise that the threatened injury is certainly impending or that there is a substantial risk that they will be harmed."

"[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–129 (2007). However, *Torcivia* and *Does 1 – 10* both demonstrate that when a plaintiff does choose to do so, and the police neither tell the plaintiff that he will be arrested for it nor bring enforcement actions against him, the Court should consider that as evidence cutting against any credible threat of prosecution. As in both *Torcivia* and *Does 1 – 10,* Father Champagne openly told the officer who visited the church that he intended to continue violating the Directive and that he would not comply with his orders; rather than telling Father Champagne that he would be arrested or arresting him on the spot, the officer returned the key to the church—enabling Father Champagne to re-open it after he left, which Father Champagne did—and left the premises.

23

Neither he, nor any other officer, contacted Father Champagne, visited the church again, or made any effort whatsoever to prevent him from continuing to violate the Directive, and as noted above, the Directive had been subsequently superseded by a less restrictive directive that allowed for religious services to resume.

In light of those facts, the Court finds that there was no credible threat of prosecution, and thus no injury in fact based on this theory for purposes of standing.[6]

### (3)    Chilled Speech or Activity

Defendant maintains that Plaintiff also has not shown actual injury in the form of chilled speech or activity, because Father Champagne testified that he never canceled mass, denied communion, confession, counseling, or last rites because of the Directive and never intended to do so. (Def.'s Mot. at 18.) Defendant analogizes this case to *Boyler v. City of Lackawanna*, 765 F. App'x 493, 496 (2d Cir. 2019), in which the Second Circuit found no injury for purposes of a § 1983 Freedom of Speech claim when despite being arrested for posts made about defendants on his Facebook page, the plaintiff continued to make similar

---

[6] While neither party raised the issue of whether the imminent injury of a "credible threat of prosecution" can support a claim for damages alone, the Court notes that the purpose of pre-enforcement challenges is to make it so that "it is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel,* 415 U.S. at 459. In other words, the purpose of a pre-enforcement actions is to let the plaintiff challenge a rule based on a substantial risk of *future* injury, but before any *actual* injury has actually occurred; as discussed above, past psychological injury that might arise as a result of threat of prosecution alone is not an injury for purposes of the First Amendment unless it either chills speech or contains some expressive condemnation of religion. Thus, even if the Court had found an imminent injury for purposes of standing based on a credible threat of prosecution, it is doubtful that claims for imminent injury can be redressed by damages, which "compensate a party for past conduct, not ongoing or future conduct. *Brown v. Buhman*, 822 F.3d 1151, 1169 (10th Cir. 2016); *see also Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006) ("claims for pre-enforcement review involve the possibility of wholly prospective future injury, not a prayer for relief from damages already sustained"). Because the Court finds no injury in fact based on the credible threat of prosecution theory, however, it does not reach the question of redressability.

posts after his arrest using the same obscene language as before the arrest, and "failed to point to any chilling effect or other injury" at his deposition. Plaintiff counters that Father Champagne forewent expression of his religion when he stopped holding mass at his parishioner's homes, and points to his testimony that "I have had people ask me to say mass at their house, sometimes when they are sick, and there is no way with all this happening, especially the policeman coming to the church, that I am going to go out to someone's house and start saying mass, get them in trouble, and myself hampered by doing something stupid." (Champagne's Dep. Tr. 118:10-19.)

Father Champagne testified to two instances in which he was purportedly unable to say mass at a parishioner's house. The first involved a parishioner named Jason Curtin who used to ask him to say mass at Mr. Curtin's house, but that after the visit from the police, "[Jason] said he wouldn't do it now because he is afraid he could get in trouble" for having mass in his home. (Champagne's Dep. Tr. 119-120).[7] The second is an incident in which Father Champagne said "a guy" whose name he could not remember was "very sick" and "wanted me to come out there and give him his last sacrament," which was about "a week or so" after the police visit happened; however, he testified that the man recovered. (*Id.* at 120-121.) He could not confirm what the man was sick with, or what town the man lived in. (*Id.* at 122.)

There is ambiguity as to whether Father Champagne chose not to say mass in his parishioners' homes as a result of the Directive and the police officers' visit, or as a result of

---

[7] It is further unclear whether Plaintiff was reliably remembering the incident or had a firm grasp on the timeline of facts, as he first confirmed that it happened "between March 16, 2020" and May 20, 2020, but later said it occurred in January, when "the cop came." (Champagne Dep. Tr. at 120-121.) However, drawing inferences in Plaintiff's favor and leaving credibility determinations for the jury, the memorandum assumes the incident took place during the time in which the Directive was in effect as Father Champagne initially stated.

his parishioners no longer making the request of him, which Plaintiff's counsel acknowledged at oral argument. In the first incident, Mr. Curtain appears to have been the one to make the determination that he did not want Father Champagne saying mass in his house any longer. As to the second incident, Father Champagne did not specifically confirm that he did not give the man his last rites because of the Directive and police; he identified this incident in response to counsel's questioning about "who asked you to come do a mass at their house and you told them no," but also responded to the question by saying that although he is "always willing" to say mass in people's houses, "[n]ow everybody is afraid to even ask me because we could get in trouble." (Champagne's Dep. Tr. at 119.) If the parishioners were the ones who revoked their requests, that would be fatal to his claim; as the Supreme Court in *Lujan* stated, "the injury has to be 'fairly trace[able] to the challenged action of the defendant, and . . . not th[e] result [of] the independent action of some third party not before the court.'" *Lujan,* 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41–42 (1976)).

The case for standing is thus a close call, resting solely on incidents that are the subject of Father Champagne's self-contradicting or unclear deposition testimony; this uncertainty presents a question of material fact and is also intrinsically tied to whether there was ultimately an infringement of Plaintiff's constitutional rights, as the issue of whether the Directive prevented him from saying mass in parishioners' houses is central to Plaintiff's Free Exercise claim. The Second Circuit has determined that "where the evidence concerning standing overlaps with evidence on the merits, the Court might prefer to proceed to trial and make its jurisdictional ruling at the close of the evidence," and if "overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court *must* leave the jurisdictional

issue for the trial." *All. For Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 (2d Cir. 2006) (emphasis added).

As such, the Court finds that the dispute over standing cannot be resolved without full evaluation of the evidence on its merits, and that the determination will be saved for trial.

### b)      Direct Harm for Establishment Clause Claim

The Second Circuit "has developed three distinct theories of standing entitling an individual to pursue a claim that the Establishment Clause has been violated: (1) taxpayer, (2) direct harm, and (3) denial of benefits." *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016). Defendant argues that because neither the first nor third theory apply, the Plaintiff must show that Father Champagne suffered a direct harm. The direct harm theory of standing requires the plaintiff to have been "directly affected by the laws and practices against which their complaints are directed," and exposed to either "a law that on its face establishes religion" ("religious law cases") or "a religious expression or message sponsored or promoted by the government" ("religious expression cases"). *Id.* at 196. For a law to qualify as a religious law, it must be "grounded in or at least significantly influenced by a 'religious' tenet or principle (e.g., the sinfulness of consuming alcohol) and directly and immediately injure[] the plaintiff's economic well-being." *Id.*  Religious expression cases occur "when a plaintiff comes into contact with, or is exposed to, a government-promoted expression of religion." *Id.* at 197. "Because this injury is often elusive, the connection between the plaintiff and the challenged action—i.e. the 'exposure'—must be direct and immediate in order to satisfy the requirement that the plaintiff have a direct and personal stake in the controversy." *Id.*

Because the Directive did not establish religion or espouse a religious message, Defendant maintains that Plaintiff cannot establish standing under either direct harm theory. (*Id.*) Plaintiff does not directly respond to Defendant's arguments as to the lack of standing

under the Establishment Clause, and the Court agrees that Plaintiff's case for an Establishment Clause violation fails at the first step by failing to show that the Directive established or promoted religion in any way.

The Court grants summary judgment to the Defendant on the Establishment Clause claim.

### 3.      Subject Matter Jurisdiction – Mootness

"A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Tann v. Bennett*, 807 F.3d 51, 52 (2d Cir. 2015). "An action seeking declaratory and/or injunctive relief against an allegedly unconstitutional statute becomes moot if the statute is repealed." *Lewis v. Cuomo*, 575 F. Supp. 3d 386, 396 (W.D.N.Y. 2021). Defendant argues that the claims for injunctive relief are moot, depriving the Court of subject matter jurisdiction, because the March 16 Directive has been superseded by the May 13 Directive and is no longer in effect, Father Champagne had moved out of the Town of Orange by the time it was superseded, and he has now passed away. (Def.'s Mot. at 24.) Plaintiff concedes that the injunctive relief claims are now moot given Father Champagne's passing. (Pl.'s Opp'n at 30.) He does not make any such concession as to declaratory relief, but based on *Lewis* and given the fact that the March 16 Directive is no longer in effect, summary judgment is granted both as to the claims for injunctive declaratory relief and declaratory relief, leaving only Plaintiff's prayer for damages.

### B.      Plaintiff's Motion for Summary Judgment

Claims under 42 U.S.C. § 1983 allow a party to seek damages and equitable relief against any person who, "acting under color of state law, subjects such person to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States." "To establish liability under § 1983 plaintiff must satisfy two essential elements: (1) defendants acted under color of state law; and (2) as a result of defendants'

actions, plaintiff suffered a denial of his constitutional rights or privileges." *Trustees of Masonic Hall & Asylum Fund v. Leavitt*, No. 5:84-CV-991 (HGM), 2006 WL 1686405, at *12 (N.D.N.Y. June 7, 2006). A county may also be sued under § 1983 for "execution of a government's policy or custom" that inflicts a constitutional violation. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978). Liability for § 1983 claims under *Monell* "applies to government officials sued in their official capacities as well*." Hughes v. City of Hartford*, 96 F. Supp. 2d 114, 116 (D. Conn. 2000).

Plaintiff asserts that he is entitled to judgment as a matter of law as to each of his § 1983 claims, which assert violations of the First and Fourteenth Amendment. (*See* Pl.'s Mem. in Support of Summ. J. [Doc. # 82].) The threshold dispute between the parties centers on the applicable standard to be applied to each claim; Defendant argues that Plaintiff's constitutional claims should all be evaluated under the "highly deferential" standard of review established for public health measures instituted during a pandemic in *Jacobson v. Massachusetts,* 197 U.S. 11 (1905), while Plaintiff argues under *Roman Cath. Diocese of Brooklyn v. Cuomo*, 208 L. Ed. 2d 206 (2020), that *Jacobson* has been superseded and all claims should be evaluated under the traditional tiers of scrutiny.

In *Jacobson,* Massachusetts instituted a law that mandated vaccination in response to the smallpox pandemic; the plaintiff alleged violation of his Fourteenth Amendment substantive due process right to bodily integrity. 197 U.S. at 12-13. The Supreme Court recognized that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." *Jacobson,* 197 U.S. at 27; *see also Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("[t]he right to practice religion freely does not include liberty to expose the community. . . to communicable disease."). *Jacobson* ultimately held that a state or local law "enacted for the public health" would only be struck down if it

had "no real or substantial relation to [the public health] or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law." 197 U.S. at 31.

Chief Justice Roberts added a non-binding gloss to *Jacobson* in his concurrence in *South Bay United Pentecostal Church v. Newsom*, 207 L. Ed. 2d 154 (2020) (Roberts, C. J., concurring), noting that restrictions on places of worship appeared consistent with the Free Exercise Clause when "[s]imilar or more severe restrictions apply to comparable secular gatherings," exempting only "dissimilar activities" in which people "neither congregate in large groups nor remain in close proximity for extended periods." *Id.* He cited to *Jacobson* for the principle that the Constitution entrusts "'[t]he safety and the health of the people' to politically accountable officials of the states, and that their latitude must be broad in situations of medical and scientific uncertainty." *Id.* at 1613-1614.

However, the Supreme Court held in *Roman Catholic Diocese* that because the restrictions challenged by plaintiffs' Free Exercise claims were not "neutral" and of "general applicability," they had to satisfy strict scrutiny. *Roman Cath. Diocese* 208 L. Ed. 2d at 206. *Roman Catholic Diocese* did not mention *Jacobson* in the majority opinion, nor did it offer any guidance as to whether its holding should be read narrowly or applied more broadly to other constitutional claims made in light of pandemic restrictions. In concurring, however, Justice Gorsuch concluded that *Jacobson* applied rational basis only because the claim at issue there was a Fourteenth Amendment challenge that did not involve any suspect classifications or fundamental rights, and that its holding does not require courts to depart from the traditional tiers of scrutiny based on the existence of a pandemic. *Id.* at 70 (Gorsuch, J., concurring).

Following *Roman Catholic Diocese,* the Second Circuit held in the context of a Free Exercise claim that reliance on *Jacobson* to "support [] the notion that courts should defer to the executive in the face of the COVID-19 pandemic" was "misplaced", and that *South Bay*

30

was "supplanted" by *Roman Catholic Diocese. Agudath Israel of Am. v. Cuomo,* 983 F.3d 620, 635 (2d Cir. 2020). While COVID-19 is relevant to the strict scrutiny analysis, the Second Circuit held that it did not warrant "special deference to the executive when the exercise of emergency powers infringes on constitutional rights," which is "precisely what the three-tiered framework for analyzing constitutional violations is for." *Id.*

With this backdrop in mind, the Court addresses each of Plaintiff's claims in turn.

### 1.   Free Exercise (Count 3)

Plaintiff argues that his Free Exercise Clause (and related Equal Protection Clause) claims must be evaluated under the traditional tiers of scrutiny. The Court agrees based on *Agudath Israel,* which applied strict scrutiny to Free Exercise challenges to COVID-19 restrictions brought by houses of worship in New York. The Free Exercise Clause protects both an individual's private right to religious belief and "the performance of (or abstention from) physical acts that constitute the Free Exercise of religion," including "assembling with others for a worship service." *Agudath Israel*, 983 F.3d at 631. There are two tiers under which Free Exercise claims can be evaluated: a "neutral and generally applicable policy is subject to only rational-basis review," and "official action burdening religious conduct that is not both neutral and generally applicable [] is subject to strict scrutiny." *Id.*

### a)   Strict Scrutiny

Plaintiff maintains that strict scrutiny should be applied because the Directive is not neutral or generally applicable; "[a] law [] lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868 (2021). Under *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise.

It is no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue."

Defendant contends that Plaintiff's Free Exercise claim warrants rational basis review because as Defendant's counsel maintained at oral argument, the Directive was meant only to put religious gatherings on the same footing as comparable secular gatherings, and "the schools in Orange already had been closed, restaurants had been closed, gyms had been closed, the Parks & Recreation Department had been closed" and "all town recreational activities" were cancelled. (Def.'s Opp'n to Pl.'s Mot. for Summ. J. [Doc. # 94] at 2; Def.'s 56(a) Stmt. ¶15.)[8] However, Plaintiff points to testimony in Defendant's deposition that similarly prohibitive orders were not issued to clubs such as the Boy Scouts or Girl Scouts, convenience stores had inside gatherings, and retail establishments were not subject to absolute prohibitions on gatherings, all of which demonstrate that religious gatherings were disadvantaged as compared to other secular gatherings. (Pl.'s Response to Def.'s 56(a) Stmt. ¶15; Pl.'s Reply to Def.'s Response [Doc. # 102] at 4.)

The Court recognizes that unlike other executive orders or directives regulating gatherings in light of COVID, this Directive was ostensibly meant to work in harmony with

---

[8] Defendant further contends that summary judgment should be denied to Plaintiff because "the analysis of a regulation's neutrality extends beyond the plain text and calls for an examination of the purpose of the regulation and the circumstances surrounding its enactment, including the historical background [and] precipitating events." (Def.'s Opp'n at 8-9.) However, such an analysis is not needed where "the minimum requirement of neutrality . . . that a [government policy] not discriminate on its face" is violated, *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). For example, in *Agudath Israel* the court found that an order like the Directive at issue here fails that standard if it explicitly singles out houses of worship for restrictions inapplicable to secular activities without considering whether religious services pose some special risk that those secular activities do not. Further, the record includes Defendant's deposition in which he discusses at length both the context and the background for the issuance of the Directive. As such, no disputed issue of material fact prevents the Court from making a finding on the Directive's neutrality.

the other orders already issued by the Governor based on Defendant's testimony, and should be considered in that context. However, Plaintiff's examples make clear that not all secular businesses in the Town of Orange were closed, and the Directive itself is unquestionably stricter than the Governor's Executive Orders, which imposed capacity limits on religious institutions in line with those imposed on other secular businesses, and never cancelled all religious services completely. Defendant's counsel maintained that businesses like convenience stores and retail establishments were not comparable because people were unlikely to gather there for extended periods of time, and that Defendant issued the Directive with the intent and understanding that it was restricting religious gatherings only to the extent that secular gatherings were restricted. However, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue," which means that the Court must evaluate the risk of spreading COVID-19 posed by each. *Id.* In *Agudath Israel,* the Second Circuit applied strict scrutiny when businesses such as retail stores, news media, financial services, and construction were not as restricted as houses of religious worship, finding that the Governor could have instead instituted truly neutral and generally applicable guidelines such as distancing or limiting capacity by time if large gatherings were the concern. 983 F.3d at 632. Thus, the Second Circuit has already made the determination there is no meaningful difference between a retail store and a house of worship in terms of COVID-19 risk. Defendant has not pointed to anything in the record that would allow the Court to find otherwise and determine that religious gatherings posed a special risk unlike that of any other secular institution that was not considered by the court in *Agudath Israel.*

Regardless of how well intentioned it might have been and the difficult circumstances under which it was issued, the Directive "expressly singles out religion for less favored treatment" by subjecting religious services to complete cancellation while not imposing such

strict measures on other businesses regardless of their size or the length of time people were gathering there, *id.*, and is thus subject to strict scrutiny.

> **b)** **Narrow Tailoring**

Neither side disputes that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," *Roman Catholic Diocese*, 141 S. Ct. at 67, leaving only the question of whether the Directive was narrowly tailored. "Narrow tailoring requires the government to demonstrate that a policy is the 'least restrictive means' of achieving its objective." *Agudath Israel,* 983 F.3d at 633 (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). Plaintiff points to the fact that Defendant did not know how many residents were high-risk for developing complications from COVID-19, that he did not know how many religious institutions were in town, and that the later May directive loosened restrictions despite rising COVID-19 rates, as evidence that the Directive was overbroad. He contends that such a blanket prohibition on religious gatherings is even less tailored to the risk of COVID-19 than the numerical or percentage capacity limits on houses of worship rejected in *Agudath Israel* and *Roman Catholic Diocese*. Defendant contends that summary judgment should be denied because open questions remain on rates of transmission, the Town's demographics, and local activities "that would make certain restrictions necessary to curb transmission among this specific population." (Def.'s Opp'n at 9.)

For narrow tailoring, however, the Defendant as a government official is the one required to demonstrate that he used the least restrictive means; unanswered questions on demographics and the number of religious institutions thus do not pose material disputes of fact, but are omissions that cut against Defendant's argument that the Directive was narrowly tailored. As noted in both *Agudath Israel* and *Roman Catholic Diocese,* fixed capacity limits that "do not account in any way for the sizes of houses of worship" or specific "particular COVID-19 transmission risks" raised by religious gatherings, and that are

34

imposed when there is "no evidence of any outbreaks" at those houses of worship, are not narrowly tailored. The fact that certain religious figures in the community requested guidance and a directive on whether services could be held does not change the results of the analysis; while it is persuasive evidence that Defendant acted with no subjective animus, it does not explain why "generally applicable restrictions on the duration of gatherings or requirements regarding masks and distancing" would not have been a feasible and less restrictive alternative. *Agudath Israel*, 983 F.3d at 634.

The Court determines therefore as a matter of law both that the Directive is subject to strict scrutiny, and that it fails that scrutiny, thus violating the First Amendment.

### c)      Injury

In addition to establishing that the challenged policy or action violates the First Amendment, "there is an injury requirement to state [a] claim" under § 1983. *Colombo v. O'Connell,* 310 F.3d 115, 117 (2d Cir. 2002); *see also Boyler,* 765 F. App'x at 496 (finding that there was no § 1983 claim for a Freedom of Speech violation when despite arrest for obscene comments on his Facebook about a police department, the plaintiff continued making obscene comments, demonstrating that his speech was not chilled.) As discussed above, there remains a dispute of material fact based on differing interpretations of Father Champagne's testimony as to whether he actually ever cancelled a service or modified his exercise of religion on the basis of Defendant's Directive, which is the injury that Plaintiff claims. The Court thus denies both Defendant's and Plaintiff's motions for summary judgment on this issue, leaving the question of both injury in fact for standing purposes and injury as an element of the § 1983 Free Exercise claim for resolution by a jury.

### 2.      Freedom of Assembly (Count 1) and Freedom of Speech (Count 2)

The First Amendment, as incorporated through the Fourteenth Amendment, prohibits a state from "abridging the Freedom of Speech[,] . . . or the right of the people

peaceably to assemble, and to petition the Government for a redress of grievances." *Butler*, 559 F. Supp. 3d at 267.

Defendant maintains that *Jacobson* continues to apply to all other types of constitutional challenges to public health measures besides Free Exercise, including Freedom of Speech and Freedom of Assembly. (Def.'s Mem. at 26-27.) Plaintiff views *Jacobson* as inapplicable to either his Freedom of Speech or Freedom of Assembly claims because both are fundamental rights under the First Amendment, unlike the substantive due process rights at issue in *Jacobson,* and asserts that any lingering precedential effect was superseded by *Roman Catholic Diocese*. (Pl.'s Opp'n at 25-26.)

However, Plaintiff's arguments are the same ones as in Justice Gorsuch's *concurrence* in *Roman Catholic Diocese*—not the majority, which does not mention *Jacobson*. This silence is telling; Justice Gorsuch's failure to garner a majority for his concurrence suggests that the Supreme Court has not determined *Jacobson* to be dead letter, and that this Court should not treat it as such. Other courts in this circuit have come to the same conclusion; as one district court explained, "[a]lthough *Roman Catholic Diocese* and *Agudath Israel* raise doubts as to *Jacobson's* continuing viability, *Jacobson* bears directly on this case and has not been explicitly overruled, which means that this Court is bound by it." *Hopkins Hawley LLC v. Cuomo*, 518 F. Supp. 3d 705, 712 (S.D.N.Y. 2021); *see also Butler v. City of New York*, 559 F. Supp. 3d 253, 265 (S.D.N.Y. 2021) (noting that the majority of courts in the Second Circuit have limited *Roman Catholic Diocese* to Free Exercise challenges.) As Defendant's counsel observed, the Directive was issued at a time in which available knowledge and data on the best way to protect communities was scarce and constantly evolving; *Jacobson* "provides a workable framework" that balances those considerations— "responding to the COVID-19 crisis versus maintaining Constitutional liberties." *Hopkins*, 518 F. Supp. 3d at 713.

"Under *Jacobson*, a state or local law 'enacted to protect the public health' will survive judicial scrutiny unless it bears 'no real or substantial relation to [the public health], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.'" *Butler,* 559 F. Supp. 3d at 264–65 (quoting *Jacobson,* 197 U.S. at 31.)  The Directive's stated purpose is to serve as a "precautionary measures to limit community transmission of the Coronavirus pandemic through people contact and large gatherings at these religious buildings located in the town of Orange." (Def.'s Ex. D [77-4].) This purpose satisfies the requirement that it be enacted to protect public health. *See Murphy v. Lamont,* No. 3:20-CV-0694 (JCH)*, 2020 WL 4435167, at *10 (D. Conn. Aug. 3, 2020), *appeal dismissed and remanded sub nom. Reale v. Lamont,* No. 20-3707-CV, 2022 WL 175489 (2d Cir. Jan. 20, 2022), *vacated as moot* (Mar. 28, 2022), *and appeal dismissed and remanded sub nom. Reale v. Lamont,* No. 20-3707-CV, 2022 WL 175489 (2d Cir. Jan. 20, 2022), *vacated as moot* (Mar. 28, 2022) (finding for purposes of the *Jacobson* analysis that "the science demonstrates that the limit on gatherings has a real and substantial relation to reducing the spread of COVID-19.") Plaintiff does not dispute that the Directive was substantially related to public health. (*See* Pl.'s Opp'n at 22, acknowledging that stemming the spread of COVID-19 is a compelling interest).

Defendant also maintains that the Directive was not a "plain, palpable invasion" of substantive rights because "through the lens of what was known to government officials at the time" and in light of the fact that *Jacobson* was the prevailing standard at the time, the constitutionality of the public health measures and the boundaries of permissible restrictions in light of a pandemic could not be known and thus could not be violated "beyond all question." (Def.'s Mem. at 28-31.) The Court agrees; regardless of how the landscape of First Amendment law may have changed after *Roman Catholic Diocese, Jacobson* was the

binding legal guidance at the time the Directive was instituted, and under *Jacobson,* no constitutional right was violated "beyond all question."

Defendant's motion for summary judgment is granted on the Freedom of Speech and Freedom of Assembly claims.

### 3.      Equal Protection (Count 5)

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). A plaintiff claiming an equal protection violation must "show adverse treatment of individuals compared with other similarly situated individuals and that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Miner v. Clinton County*, 541 F.3d 464, 474 (2d Cir. 2008).

Plaintiff's Equal Protection claim is based on the assertion that the Directive "represses a fundamental right—the Free Exercise of religion," and is both intrinsically tied to Count 3 and evaluated under the same standard. The Court denies summary judgment to both parties on the same grounds as articulated in the section on Free Exercise above.

## V.    Conclusion

1)  Plaintiff's motion for summary judgment is denied on all counts.

2)  Summary judgment is granted to Defendant as to Plaintiff's claims for injunctive and declaratory relief on all counts.

3)  Summary judgment is also granted to Defendant on Count 1 (Freedom of Assembly), Count 2 (Freedom of Speech), and Count 4 (Establishment Clause).

4) Defendant's summary judgment motion is denied as to Count 3 (Free Exercise)[9] and the related Count 5 (Equal Protection), which will proceed to trial.

The parties are directed to file their joint trial memorandum within 30 days.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 10th day of March, 2023

---

[9] Trial will determine both "injury in fact" for standing purposes as well as "injury" for § 1983 purposes.